UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MICHELLE SPIRLES,

        Petitioner,

   v.

SUPERINTENDENT SABINA KAPLAN,

        Respondent.

16-CV-1044
DECISION AND ORDER

---

On October 24, 2011, a New York State Court jury found the *pro se* petitioner,

Michelle Spirles, guilty of manslaughter in the first degree in connection with the death

of Andre Biggs in Rochester, New York, on April 2, 2011. Docket Item 12-2 at 1496.

The judge sentenced Spirles to twenty-five years' imprisonment and a five-year period

of post-release supervision, the statutory maximum penalty. *Id.* at 1513-14, 1524.

On December 1, 2016, Spirles filed a petition for a writ of habeas corpus in the

United States District Court for the Southern District of New York, Docket Item 1, which

was transferred to this Court on December 8, 2016, Docket Item 4. On June 30, 2017,

the state responded, Docket Items 12, 13; and on July 13, 2017, Spirles replied, Docket

Item 14.

Read liberally, the petition raises claims under the Fourth, Fifth, and Sixth

Amendments. Because Spirles's Fourth and Sixth Amendment claims lack merit, and

because any Fifth Amendment error was harmless, the petition is denied.

## FACTS

**I.     THE EVIDENCE AT TRIAL**

Deborah Kerley, an emergency room physician at Rochester General Hospital,
testified that she treated Andre Biggs in February 2011—about a month and a half
before his death on April 2.  Docket Item 12-2 at 947-48.  He "had several lacerations
on his left side of his scalp and on his ear."  *Id.* at 948.  Biggs told Kerley that "he had
been cut by his girlfriend at home."  *Id.* at 949.

Spirles's next-door neighbor testified that Biggs had been Spirles's boyfriend but
that they had broken up some time before April 2, 2011.  *Id.* at 1295, 1307.  Until then,
the neighbor said, Biggs was at Spirles's home at 123 Evergreen Street in Rochester
"every day" and lived "next door . . . with [Spirles]."  *Id.* at 1293, 1295.  The neighbor
testified that at about 12:30 a.m. on April 2, 2011, he looked out his window because of
"some commotion outside."  *Id.*  He saw Biggs in a vehicle and Spirles reaching into the
vehicle.  *Id.* at 1296.  And he heard Spirles "screaming" at Biggs: "I'm gonna fuck you
up."  *Id.* at 1297.

The neighbor called the police because he thought he saw a drug transaction.
*Id.* at 1300.  He testified that after the police arrived, Biggs exited the car and walked up
the street.  *Id.* at 1298, 1300.  Spirles followed him, repeating that "she's gonna fuck him
up."  *Id.*

Biggs's brother-in-law, Eddie Thomas, testified that he lived in Rochester with his
son, his stepdaughter, and his wife—Biggs's sister.  *Id.* at 542-43.  Biggs sometimes
would stay with them but usually stayed with Spirles.  *Id.* at 543-44.

Thomas said that on April 2, 2011, Biggs arrived at his house at about midnight or 1:00 a.m. and left at about 3:10 a.m. *Id.* at 545-46. When he left, Biggs told Thomas that he was going to Spirles's house to pack up his things because he was breaking up with her. *Id.* Biggs told Thomas that he needed something to put his clothes in, so Thomas gave Biggs a black gym bag. *Id.* at 546-47. Thomas said that Biggs asked for the bag "so, he could put his clothes, items in [it], so [that] he could leave her." *Id.* at 547.

The prosecutor showed Thomas a photo of a bag taken from the scene of the crime. *Id.* at 549. When asked if that was "the way [the] gym bag looked when you gave it to [Biggs] on April 2nd," Thomas said it was not because when he gave it to Biggs, "there wasn't nothing in it." *Id.* But "[b]esides there being clothes in it, . . . that [was] the way it appeared." *Id.*

Thomas testified that when Biggs left his home, Biggs was wearing an "Elmer Fud-like hat" that had "floppy ears and fur inside." *Id.* at 547. He also was wearing "a gray sweater that [Thomas had] loaned to him, a white T-shirt, [and] a black jacket." *Id.* at 548. And he carried the gym bag across his body. *Id.*

Thomas identified Biggs on surveillance videos walking back toward the area where Spirles lives at about 3:22 a.m. *Id.* at 552-53. In the video, Biggs was walking alone. *Id.* at 553. Video surveillance also showed Biggs walking unharmed outside a pawn shop about a ten-minute walk away from 123 Evergreen Street during the early morning hours of April 2, 2011. Trial Exhibit 80.

A police dispatcher with Monroe County 911—David Mossworth—testified that he was working during the early morning hours of April 2, 2011. *Id.* at 1102-04. He

received an incoming 911 call at 4:05 a.m. from a man who said that he was calling from 123 Evergreen Street. *Id.* at 1104. Mossworth dispatched police and an ambulance to the address after the caller "mentioned someone was stabbed and he mentioned they [sic] weren't breathing." *Id.* at 1105.

A Rochester police officer—Wilfredo Carbonel, Jr.—testified that on April 2, 2011, at 4:09 a.m., he was the first police officer to arrive at Spirles's apartment in response to a call about a stabbing. *Id.* at 573-74. Carbonal saw a lot of blood on the porch of 123 Evergreen Street. *Id.* at 577. When he entered the building, he found Spirles frantically yelling for help. *Id.* at 575, 577. She was standing over Biggs who was bleeding profusely from the neck and chest. *See id.* at 578-79. Spirles was applying pressure to his neck to stop the bleeding. *Id.* at 579.

Spirles's son, James Torrance, also was in the apartment. *Id.* at 578, 585. Carbonel identified Torrance as the 911 caller. *Id.* at 585. After emergency medical services arrived, Carbonel and Spirles went to her bedroom so that Spirles could get dressed. *Id.* at 592-93. Carbonel observed that there was no blood in Spirles's bedroom. *Id.* at 593.

Carbonel had a short conversation with Spirles after she was dressed. *Id.* at 620. Spirles told Carbonel that she was sleeping when she heard someone knocking on her door. *Id.* at 594. When she answered the door, she found Biggs there, and he immediately stumbled into her arms and then fell to the floor. *Id.* at 594. Spirles told Carbonel that Biggs had a key to her place despite the fact that "they had been broken up for a period of time." *Id.* Spirles never asked for an attorney. *Id.* at 596. After their

conversation in the bedroom, Spirles washed up and Carbonel had her sit in the back of a police car. *Id.* at 596.

Mark Gestring, M.D., a trauma surgeon at Strong Memorial Hospital, testified that Biggs arrived at the hospital on April 2, 2011, with CPR in progress. *Id.* at 820, 823. Dr. Gestring said that Biggs "had a stab wound to his left neck and had apparently bled out at the scene." *Id.* at 823. He testified that "reports from the scene was that there was a lot of blood loss" and that this was "consistent with the amount of blood that was covering him when he arrived." *Id.* at 824. Biggs's "heart had stopped prior to his arrival at the hospital." *Id.* Doctors at the hospital were able to restore Biggs's heartbeat, but then the "wound began to hose blood." *Id.* at 825-26. Dr. Gestring testified that he was unable to save Biggs's life that day. *Id.* at 828.

Police Investigator John Penkitis testified that on April 2, 2011, he arrived at Spirles's home at about 6:20 a.m. *Id.* at 1119-20. Torrance let him and another police investigator—Cathy Lucci—into the apartment at about 7:15 a.m., *id.* at 1124-25, and then was taken to a Rochester police station for further questioning while the officers remained at the apartment for about another hour. *Id.* at 1130. Later, Penkitis and Lucci went to the Rochester police station and spoke with Torrance and another individual. *Id.* at 1131.

Penkitis and Lucci also interviewed Spirles at the police station. *Id.* at 1131-32. That extensive interview, addressed in some detail below, was videotaped, and most of the interview was played for the jury. Docket Item 12-2 at 1179-88.

Spirles's landlord testified that he had replaced the lock on the front door on

March 30, 2011. *Id.* at 1278. Spirles had

> called [him] and said that she lost the keys or somebody took her keys from the property and she was uncomfortable with that fact and asked [him] to replace the dead bolt on her front door, which is what we did. I came over there. I took the old lock and installed the brand new one and gave her the keys for it.

*Id.* at 1278.

Finally, Penkitis and several other police officers who searched Spriles's

apartment testified that they saw a duffel bag on Spirles's couch just like the one that

Thomas gave to Biggs. *Id.* at 1163. And the bag had "some clothing that was packed

in it that was folded and placed inside of it." *Id.*

## II. SPIRLES'S STATEMENTS TO LUCCI AND PENKITIS[1]

### A. Spirles's Statements Between 11:07 a.m. and 11:34 a.m.

After Lucci and Penkitis read Spirles her Miranda rights at about 11:07 a.m.,

Spirles agreed to be interviewed. Spirles said that she had known Biggs for about nine

months and at one time had a romantic relationship with him. She said that she and

Biggs once lived together during their relationship, but he "just disappeared" about two

weeks before his death and Spirles did not know where he went.

Spirles said that about two days before Biggs's death, his uncle came to Spirles's

house with some of Biggs's belongings, including some sheets. Spirles told Biggs's

---

[1] These facts are taken from a 10-hour video recording labeled Trial Exhibit 86. The video recording was available to the jury and substantial portions were played for the jury at trial. Docket Item 12-2 at 1179-88.

uncle that she did not want Biggs to come back. Nevertheless, Biggs "just popped up" on the night of his death.

Spirles said that when Biggs showed up at her house, "he came in the room, he stood for a minute, then he walked back." He then collapsed and said something about being stabbed. When Biggs fell, Spirles screamed and Torrance ran downstairs. She was putting pressure on the stab wound, "pumping his chest and everything," and she told Torrance to call 911.

Spirles then changed the story she had told Carbonel earlier: earlier, she had said that Biggs knocked on the door and she answered it to find him gravely injured; now, she said that she had been sleeping and when she woke up, Biggs was standing over her. According to Spirles, Biggs "was like 'I'm cut' or something." She saw blood and it was disgusting. She did not know where Biggs had been before that. He said nothing about who may have stabbed him. Spirles reiterated that she grabbed his neck, trying to put pressure on it, and told her son to call 911. She kept pumping his chest trying to get him to breathe.

Spirles said that Biggs was able to enter her apartment because he had a key. She first said that the landlord had changed her locks a couple of days before because somebody had "kicked her back door in." But she then said that the landlord had not actually changed the locks but had only fixed the back door. So "the keys were the same."

Lucci and Penkitis then left the room. When they returned, they told Spirles that they had spoken with her landlord who said that he had, in fact, changed the locks. Spirles said, "No he didn't; that's the same damn key." She reiterated that he only fixed

the door and did not change the locks. She said that she wanted him to change the locks but that he said that he couldn't do that.

Spirles said that she had a good relationship with Biggs and that "out of the blue" he just stopped coming around. Lucci asked Spirles about an incident about a month before when Biggs was hit on the head and went to the hospital. Spirles said "that happened too on the streets and he came to my house bleeding." She remembered that Biggs did, in fact, visit her once after his uncle brought his belongings to her house. She said Biggs came looking for his "card." "He was like where's my black card." She said that she pointed Biggs to the box of belongings that the uncle brought over and that Biggs retrieved whatever he was looking for and left.

### B.    Spirles's Statements Between 11:34 a.m. and 3:24 p.m.

At about 11:34 a.m., Spirles said that she was "through talking," but she continued to answer questions from Lucci and Penkitis. She said that the blood spattered because "it was coming out everywhere," not because Biggs was stabbed in her home. Spirles did not see Biggs with keys in his hand that night, but she was sure that he entered with his key.

Lucci told Spirles that it was important for her to tell them whether she had perhaps reacted to some violent behavior or was otherwise defending herself, but Spirles responded by saying "arrest me or you can let me go."

Later that afternoon, Lucci and Penkitis returned and asked Spirles to run through her story again. Spirles reiterated that she awoke to find Biggs standing over her. He walked back into the room where all the blood is. He mumbled something, sat

on the edge of her chair, and "hit the floor." She then jumped up, screamed, and tried to help him. She could not remember seeing anything in his hands.

Spirles mentioned that she had seen Biggs in the evening on April 1, 2019, the day before he died. She said that he was in a car but that she did not speak with him other than asking "what's up" while she was on her way to the store.

At 2:58 p.m., Lucci told Spirles that Biggs passed away. Spirles said that she already knew that because another police officer had told her.

Lucci repeated that it did not make sense for Spirles to lie, and Spirles again told her story. When asked why there was no blood in her bedroom, Spirles said that she did not know. She said that there was some blood on her sheets, but the officers noted that it was only a "tiny little drip of blood." She said, "Whoever [Biggs] was with, that's who must have stabbed him." Spirles again told the police officers to arrest her or let her go because she was "starving." Spirles told the police that she had nothing else to say.

Lucci asked Spirles about the duffel bag on her couch and whether she knew where the duffel bag came from. Spirles said that she did not. She volunteered that blood near the bottom of the walls showed that she did not stab Biggs because if she had, blood would be near the top of the walls. After Spirles again said that she was through speaking, Lucci said that there was no doubt in her mind that Spirles stabbed Biggs and asked why. Spirles refused to answer, requesting again that she be arrested or released.

At 3:07 p.m., after Spirles again said that she wanted to be arrested or released—this time, so that she could arrange for child care—Penkitis told Spirles that

this was her chance to tell her side of the story. But Spirles said that she had told them everything she knew. Penkitis asked why Spirles thought Biggs had come to her house. Lucci observed that something must have happened between the time Biggs walked into Spirles's apartment and the time the police got there. But Spirles said that she "doesn't know—there are gangs and [stuff]." And she said that she "doesn't know what happened to him." She said, "they sell drugs and all that [stuff]. . . .I don't know who . . . stabbed him on my porch."

After that, at 3:12 p.m., Lucci and Penkitis continued asking Spirles questions but Spirles sat in silence. At 3:17 p.m., Lucci left the room briefly to get some paperwork, returned to the room, and asked Spirles some questions about personal identifying information, which she answered. At 3:24 p.m., Lucci told Spirles that she was going to be charged with murder and the interview ended.

### III.     THE VERDICT

The jury acquitted Spirles of second-degree murder, Docket Item 12-2 at 1495-96, but found her guilty of first-degree manslaughter. *Id*. at 1496.

### DISCUSSION

"Under 28 U.S.C. § 2254, 'a person in custody pursuant to the judgment of a State court' may petition a district court for a writ of habeas corpus 'on the ground that [she] is in custody in violation of the Constitution or laws or treaties of the United States.'" *Orlando v. Nassau Cty. Dist. Attorney's Office*, 915 F.3d 113, 120 (2d Cir. 2019) (quoting 28 U.S.C. § 2254(a)). Because Spirles is proceeding *pro se*, this Court

holds her submissions "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

Spirles raises three arguments challenging the validity of her conviction. Docket Item 2 at 7. Her first two arguments claim that the police violated her Fourth Amendment rights. *Id.* Specifically, Spirles contends that the police violated her Fourth Amendment rights when collecting evidence without a warrant at her apartment before 10:00 a.m. on April 2, 2011. *Id.* Second, Spirles argues that her Fourth Amendment rights were violated because of "fraudulent statements and misapplied fact[s]" in the warrant application. *Id.*

Spirles's third argument is that her Sixth Amendment right to counsel was violated

> [a]fter six hours of police custody, when police interview questions turned to unsubstantiated, blatant accusations [and Spirles] asked for an attorney as the record shows and police questioning did not cease. [Spirles] was never provided counsel, and the interrogation continued for another ten hours[.]

*Id.*

## I.     FOURTH AMENDMENT CLAIMS

"The Fourth Amendment assures the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Stone v. Powell*, 428 U.S. 465, 482 (1976). It "was intended to protect the 'sanctity of a man's [sic] home and the privacies of life' . . . from searches under unchecked general authority." *Id.* (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

Related to the Fourth Amendment is the "exclusionary rule"—"a judicially created means of effectuating the rights secured by the Fourth Amendment" by prohibiting the use of evidence seized in violation of the Fourth Amendment. *Id.* at 482-83. "The

primary justification for the exclusionary rule . . . is the deterrence of police conduct that violates Fourth Amendment rights." *Id.* at 486. That consideration "support[s] the implementation of the exclusionary rule at trial and its enforcement on direct appeal of state-court convictions." *Id.* at 493. "But the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs." *Id.* "There is no reason to believe . . . that the overall educative effect of the exclusionary rule would be appreciably diminished if search-and-seizure claims could not be raised in federal habeas corpus review of state convictions." *Id.* "Even if one rationally could assume that some additional incremental deterrent effect would be present in isolated cases, the resulting advance of the legitimate goal of furthering Fourth Amendment rights would be outweighed by the acknowledged costs to other values vital to a rational system of criminal justice." *Id.* at 493-94.

Therefore, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, . . . a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at [her] trial." *Id.* at 494. Accordingly, the Second Circuit has concluded that "review of fourth amendment claims in habeas petitions [is to] be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). "[T]he focus of the inquiry as to whether there has been an 'unconscionable breakdown' in the state corrective process

is on 'the existence and application of the corrective procedures themselves' rather than on the 'outcome resulting from the application of adequate state court corrective procedures.'" *Singh v. Miller*, 104 F. App'x 770, 772 (2d Cir. 2004) (quoting *Capellan*, 975 F.2d at 71).

Spirles does not claim that New York has not provided a corrective procedure to redress alleged fourth amendment violations, and "the 'federal courts have [long] approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.*, . . . as being facially adequate.'" *Capellan*, 975 F.2d at 70 n.1 (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)). What is more, at a motion argument before her trial, Spirles raised issues regarding "probable cause for [her] arrest and suppression of evidence obtained as a result of a warrantless search and any post-warrant search." Docket Item 12-2 at 21. The state court held a suppression hearing on July 26, 2011, which was continued until August 24, 2011, to address her suppression claims. Docket Item 12-2 at 39-198.

Spirles argued in her state court proceedings that her right to cross-examine certain witnesses was unduly restricted at the suppression hearing. *See* Docket Item 92-95. But even if the suppression court erred, this Court cannot fairly say that the errors rise to the level of an "unconscionable breakdown in the underlying process." *Capellan*, 975 F.2d at 70. To constitute such a breakdown, the circumstances must be akin to bribery of the trial judge, the prosecution's knowing use of perjured testimony, a guilty plea extracted by torture, or a conviction obtained after a trial that was dominated by an angry mob. *See id.* (citing *Frank v. Mangum*, 237 U.S. 309 (1915)). Here, the record demonstrates that Spirles had a legitimate state forum for her exclusionary rule

claims and that those claims were again considered by a state appellate court. In light of all that available "state corrective process," *Singh*, 104 F. App'x at 772, Spirles is not entitled to federal habeas relief on her Fourth Amendment claims.

## II.     FIFTH AND SIXTH AMENDMENT CLAIMS

Spirles also argues that her Sixth Amendment right to counsel was violated when she asked for an attorney during her custodial interrogation and the police continued to question her. Docket Item 2 at 7. The respondent argues that this claim is unexhausted and that, as a matter of state law, it is procedurally defaulted. Docket Item 13 at 23-24. But "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies in the courts of a State." 28 U.S.C. § 2254(b)(2).[2] What is more, "if the record refutes the applicant's factual allegations . . . a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). In this case, the record refutes Spirles's factual allegations about her right-to-counsel claim, and any other arguable error was harmless.

---

[2] Even if Spirles's claim had merit, this Court may be unauthorized to grant relief because Spirles has not exhausted her claim in state court. And while it may well be that Spirles has procedurally defaulted that claim as a matter of state law, federal courts prefer that a state court actually "rel[y] on a procedural bar as an independent basis for the disposition of the case, and [that] the state court's reliance on state law . . . be unambiguous and clear from the face of [an] opinion," rather than determine the procedural default issue in federal court. *Galarza v. Keane*, 252 F.3d 630, 637 (2d Cir. 2001).

## A.    Sixth Amendment Claim

"The Sixth Amendment provides that 'in all criminal prosecutions, the accused shall enjoy the right to have the Assistance of Counsel for his defence.'" *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).  The Sixth Amendment right to counsel "does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Id.* (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)).  Spirles's interrogation took place before her prosecution began. Therefore, there was no bar to the admission of the statements in this case under the Sixth Amendment.

## B.    *Miranda* Right to Counsel

The Fifth Amendment includes "the right to have counsel present" during a "custodial interrogation."  *Id.* at 176.  But "statements elicited during custodial interrogation [are] admissible if the prosecution [can] establish that the suspect 'knowingly and intelligently waived [her] privilege against self-incrimination and [her] right to retained or appointed counsel.'" *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)).  Invoking the Fifth Amendment right to an attorney during a custodial interrogation "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."  *Id.* at 178.

Here, Spirles specifically alleges that:

[a]fter six hours of police custody, when police interview questions turned to unsubstantiated, blatant accusations [and she] asked for an attorney, . . . the record shows [that] police questioning did not cease.  [Spirles] was never provided counsel, and the interrogation continued for another ten hours[.]

Docket Item 2 at 7.  But Spirles's assertion is plainly refuted by the record, which demonstrates that she made no statement whatsoever regarding an attorney to her custodial interviewers in that timeframe.

In response to Spirles's habeas petition, the respondent included a video recording of the investigation room where Spirles was held and interviewed on April 2, 2011.  The video recording runs from 9:16 a.m. until after 7:38 p.m., the time Spirles finally leaves the room.[3]  This Court has watched the entire video recording.

Spirles's questioning did not begin until about 11:00.  At that time, police investigators Lucci and Penkitis entered the investigation room.  At 11:07, Lucci advised Spirles of her *Miranda* rights to counsel and to remain silent.  She asked Spirles whether Spirles would agree to speak to them with those rights in mind, and Spirles answered affirmatively without mentioning an attorney.  Spirles's first round of interrogation ended at 11:17 without Spirles ever asking for an attorney.

At 11:29, after speaking with Spirles's landlord, Lucci and Penkitis returned to verify one of Spirles's statements.  After about 11:30, Lucci began to confront Spirles about what Lucci and Penkitis believed to be inconsistencies between Spirles's story and other evidence.  The Court is confident that this is the point that Spirles describes as the interrogation becoming "unsubstantiated, blatant accusations," Docket Item 2 at 7.  At 11:34, Spirles became frustrated and said, "okay I'm through talking"; she asked Lucci and Penkitis whether they were going to arrest her or let her go.  But Spirles did not mention an attorney.  At 11:41, after Lucci again told Spirles that her story "isn't making sense," Spirles again asked them to "arrest me or let me go" and said that she

---

[3] The recording displays an empty room from 7:38 p.m. until 8:10 p.m.

was tired.  But she did not ask for an attorney.  Shortly afterward, Lucci and Penkitis left the room.

At 2:53 p.m., Lucci and Penkitis returned to the investigation room.  Spirles repeated her version of the events as they had occurred earlier that day, but she did not request an attorney.  At 3:03, and again at 3:05-3:06, Spirles repeated her demand that she either be arrested or released; and at 3:07, she asked Lucci and Penkitis to arrest her and charge her if they thought that she committed the crime.  But she did not ask for an attorney.

Because the record clearly refutes Spirles's factual allegation that "[a]fter six hours of police custody, when police interview questions turned to unsubstantiated, blatant accusations, [she] asked for an attorney," Docket Item 2 at 7, Spirles's *Miranda* right-to-counsel claim is without merit.

### C.      *Miranda* Right to Silence

This Court is obligated to interpret Spriles's *pro se* submissions "to raise the strongest arguments that they suggest."  *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 472 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).  In light of that obligation, the Court construes Spirles's right-to-counsel claim as a *Miranda* right-to-silence claim.  And in that regard, Lucci and Penkitis may well have violated her constitutional rights.

If an individual subject to a custodial police interrogation indicates that she "wishes to remain silent, the interrogation must cease."  *Michigan v. Mosley*, 423 U.S. 96, 100 (1975); *see United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996).  "[T]he relevant inquiry is whether the defendant 'unambiguously' invoked his *Miranda* rights,"

including the right to remain silent. *United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). At the same time, "[a] suspect need not rely on talismanic phrases or any special combination of words to invoke his Fifth Amendment right to remain silent." *Ramirez*, 79 F.3d at 304. "Once a suspect has unequivocally invoked his right to remain silent 'whether in the form of refusing to answer questions or asking that an ongoing interrogation be terminated, his request must be scrupulously honored.'" *Id.* (quoting *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989)).

Here, Lucci and Penkitis continued to question Spirles after she said several times that she was "through talking," beginning at 11:34 a.m. Over the next several hours, she continued to say she was "through talking" and asked the officers to arrest her or let her go. But the questions continued.

Spirles's statements that she was "through talking" were arguably unambiguous, repeated invocations of her right to remain silent. They should have prompted Lucci and Penkitis to stop their questioning. But even if Spirles's *Miranda* rights were violated by the continued questioning, this Court concludes that any error was harmless.

### D.   Harmlessness

Almost all of the video-recorded interview was played for the jury at trial, and the entire video was available to the jury. *See* Docket Item 12-2 at 1179-88. If the questioning after 11:34 a.m. violated Spirles's *Miranda* rights, then admitting that part of the video was error. So the question is whether the admission of that part of the video after 11:34 a.m. was harmless error.

In considering whether the erroneous admission of evidence was harmless, the relevant question "is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). "In making a determination of harmless error, the court looks to the record as a whole, considering the overall strength of the prosecution's case, the importance of the improperly admitted evidence, and whether the evidence was emphasized at trial." *Brown v. Keane*, 355 F.3d 82, 92 (2d Cir. 2004).

Applying these factors, Spirles has not established actual prejudice resulting from the statements she made to Lucci and Penkitis after she said she was "through talking." Because the prosecution's case against her was strong, and because most of the statements that Spirles made after she first arguably invoked her right to remain silent at 11:34 a.m. simply repeated statements she made earlier, Spirles has not established actual prejudice.

Spirles's story was that Biggs was stabbed before she saw him that night. According to the final version she told the police, Biggs let himself into her apartment with his key, stumbled bleeding into her bedroom while she was sleeping, and then collapsed in her living room. But the inconsistencies in Spirles's story and the physical evidence belied her version of the events.

First, Spirles initially told an entirely different story: that Biggs had knocked on her door and that she had answered it. She also first said that her landlord had changed her locks—something the landlord corroborated—but then said that the landlord had only fixed the door and that the key Biggs had therefore still worked. These inconsistencies—established by what she said before 11:34 a.m.—were enough to seriously question Spirles's credibility.

Second, while there was a good deal of blood on the porch and elsewhere in her home, there was little or no blood in her bedroom or before the entrance to the porch. So the stabbing must have occurred at Spirles's home where only she and her son were present.

Third, Biggs's duffel bag—which Thomas had given him empty earlier that night—was found in Spirles's apartment with clothes in it. So Biggs must have been in Spirles's home and packed some of his belongings that night—presumably before he was stabbed.

Before 11:34 a.m. when she said she was done talking, Spirles had already said that she woke to see Biggs standing over her bed after having been stabbed. That statement was inconsistent with her earlier statement that she had heard Biggs knocking at the door and answered it. And it was inconsistent with evidence showing little blood in her bedroom.

Likewise, before 11:34 a.m., Spirles had already told Lucci and Penkitis that Biggs had a key to her apartment but that the landlord had changed the locks a few days before Biggs's death. She then immediately changed her story, saying that the landlord had not actually changed the locks but had only fixed the door. That was

inconsistent with what her landlord said, suggesting that Biggs could not have entered the apartment himself because he no longer had a key. Spirles's decision to change her story mid-stream during the interview—from a story consistent with her landlord's testimony and with her original statement to Carbonel to a story that she was asleep when Biggs entered her bedroom bleeding—further damaged her credibility. And that would have been seen by the jury regardless of whether her statements made after 11:34 a.m. were admitted.

It is true that after 11:34 a.m., Spriles became increasingly curt with Lucci and Penkitis in a way that was even more damaging to her credibility. And her stories—especially regarding how Biggs might have had a key to her apartment—became even more convoluted after 11:34 a.m., straining her credibility even further. Nevertheless, given that the substance of her statements made before 11:34 a.m. was entirely the same as what she said afterward, and considering the other evidence submitted at trial, this Court is satisfied that any error resulting from the introduction of the later statements was harmless.[4]

---

[4] The only part of the video recording after 11:34 a.m. that the state emphasized in closing was Spirles's reaction to being told that Biggs had passed away. The prosecutor said:

> there's a part in the recorded interview that you have all seen where she's told that Mr. Biggs has passed away, her boyfriend of eight to nine months. Whether it's a boyfriend or ex-boyfriend, Investigator Lucci says, "I hate to tell you this, but Andre passed away." Her reaction was so cold. It could have been like Investigator Lucci was asking her to pass the mustard. I would ask you to think about that when thinking about this horrible situation that she found herself in and that she woke up from.

Docket Item 12-2 at 1426-27. But the prosecutor asked the jury to draw the same inference from Spirles's reaction during the 911 call. Ultimately, this reliance does not add much in favor of Spirles in the harmless error analysis.

**CONCLUSION**

For the foregoing reasons, Spirles's petition for a writ of habeas corpus, Docket

Item 2, is DENIED, the case is DISMISSED, and the Clerk of Court shall close the file.[5]

SO ORDERED.

Dated:        January 20, 2020
              Buffalo, New York


                                           *s/ Lawrence J. Vilardo*
                                           LAWRENCE J. VILARDO
                                           UNITED STATES DISTRICT JUDGE

---

[5] Spirles raises several new arguments in her reply, but this Court declines to consider them because the Rules Governing Section 2254 Cases in the Federal District Courts require that her petition "specify all [her] grounds for relief," Rule 2(c)(1), and "[a]rguments may not be raised for the first time in a reply brief." *Alnutt v. United States*, 588 F. App'x 45, 47 (2d Cir. 2014) (quoting *United States v. Gigante*, 39 F.3d 42, 50 n.2 (2d Cir. 1994)).